# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANDREW CHIEN, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. _____ |
| v. | ) | |
| | ) | CT STATE DOCKET NUMBER: NNH- |
| | ) | CV-09-5025938-S |
| SKYSTAR BIO PHARMACEUTICAL | ) | |
| COMPANY, SCOTT CRAMER, STEVE | ) | |
| LOWE, DAVID WASSUNG and WEIBING | ) | |
| LU, | ) | |
| | ) | |
| Defendants. | ) | January 27, 2009 |

## <u>NOTICE OF REMOVAL</u>

Defendants Skystar Bio Pharmaceutical Company, Scott Cramer, Steve Lowe,

David Wassung, and Weibing Lu file this Notice of Removal of this action to the United States

District Court for District of Connecticut from the Superior Court for the Judicial District of New

Haven where the action is now pending, as provided by Title 28, U.S. Code, Chapter 89 and

state:

        1.      This action was commenced in the Superior Court for the Judicial District

of New Haven at New Haven and is now pending in that court.  Process was served on the

defendants on dates uncertain, but not earlier than December 29, 2008.  A copy of the plaintiff's

Complaint, which was first received by the defendants on dates uncertain, but not earlier than December 29, 2008, is attached hereto as Exhibit A.

2.      There are no defendants to this action except Skystar Bio Pharmaceutical Co., Scott Cramer, Steve Lowe, David Wassung, and Weibing Lu.

3.      The gravamen of this action is alleged securities fraud in connection with a reverse merger.  The Plaintiff alleges various violations of the Securities Act of 1933, the Securities Exchange Act of 1934, and related federal regulations.  The plaintiff also asserts ancillary state law claims.  The United States District Court for the District of Connecticut has jurisdiction by reason of 28 U.S.C. § 1331 in that this action arises under federal law.

4.      Defendants further allege that the action was commenced by the service of the Complaint on dates uncertain, but not earlier than December 29, 2008, and that the time has not elapsed within which they are allowed to file this notice of removal.

5.      Defendants are providing a copy of this notice to the plaintiff and the clerk of the Superior Court for the Judicial District of New Haven as required by 28 U.S.C. § 1446(d).

WHEREFORE, Defendants request that this action proceed in this Court as an action properly removed to it.

Dated:  January 27, 2009

Respectfully submitted,

THE DEFENDANTS,
SKYSTAR BIO PHARMACEUTICAL CO.,
SCOTT CRAMER, STEVE LOWE, DAVID
WASSUNG, AND WEIBING LU
BY CUMMINGS & LOCKWOOD LLC
THEIR ATTORNEYS

By_____
   Timothy M. Herring (ct26523)
   Six Landmark Square
   Stamford, CT 06901
   Tel:  203-327-1700
   Fax:  203-708-3892
   E-mail:  therring@cl-law.com

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing NOTICE OF REMOVAL was

mailed this 27th day of January, 2009, via first class mail, postage prepaid, to the following:

      Andrew Chien
      665 Ellsworth Avenue
      New Haven, CT 06511
      203-562-8899

      Clerk of the Superior Court
      Judicial District of New Haven at New Haven
      235 Church Street
      New Haven, CT 06510

                                   Timothy M. Herring

2503101_1.doc 1/27/2009

# EXHIBIT A

**SUMMONS - CIVIL**
JD-CV-1 Rev. 9-08
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a,
52-48, 52-259,  P.B. Secs. 3-1 through 3-21, 8-1

**STATE OF CONNECTICUT**
**SUPERIOR COURT**
www.jud.ct.gov

**See page 2 for instructions**

☐ "X" if amount, legal interest or property in demand, not including interest and costs is less than $2,500.

☒ "X" if amount, legal interest or property in demand, not including interest and costs is $2,500 or more.

☒ "X" if claiming other relief in addition to or in lieu of money or damages.

TO: Any proper officer, BY AUTHORITY OF THE STATE OF CONNECTICUT, you are  hereby commanded to make due and legal service of this Summons and attached Complaint.

| Address of court clerk where writ and other papers shall be filed (Number, street, town and zip code) (C.G.S. §§ 51-346, 51-350) | Telephone number of clerk (with area code) | Return Date (Must be a Tuesday) |
|---|---|---|
| 235 Church st. New Haven, CT 06510 | ( ) | January 20, 2009 |
| | | Month / Day / Year |

| ☐ Judicial District | ☐ G.A. | At (Town in which writ is returnable) (C.G.S. §§ 51-346, 51-349) | Case type code (See list on page 2) |
|---|---|---|---|
| ☐ Housing Session | Number: | New Haven, CT | Major:        Minor: |

**For the Plaintiff(s) please enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented (Number, street, town and zip code) | Juris number (to be entered by attorney only) |
|---|---|
| Andrew Chien 665 Ellsworth Ave. New Haven, CT 06511 | |

| Telephone number (with area code) | Signature of Plaintiff (if self-represented) |
|---|---|
| (203) 562-8899 | A. Chien |

| Number of Plaintiffs: 1 | Number of Defendants: 5 | ☒ Form JD-CV-2 attached for additional parties |
|---|---|---|

| Parties | Name (Last, First, Middle Initial) and Address of Each party (Number; Street; P.O. Box; Town; State; Zip; Country, if not USA) | |
|---|---|---|
| First Plaintiff | Name: Andrew Chien <br> Address: 665 Ellsworth Avenue, New Haven, CT 06511 | P-01 |
| Additional Plaintiff | Name: <br> Address: | P-02 |
| First Defendant | Name: Skystar Bio pharmaceutical Co. <br> Address: Nevada corporation Headquarter Inc <br> 101 Convention center Drive #700, Las Vegas, NV 89109 | D-50 |
| Additional Defendant | Name: Scott Cramer <br> Address: Cramer & Associate Incorporation <br> 1012 Lewis Dr. Winter Park, FL 32789 | D-51 |
| Additional Defendant | Name: Steve Lowe, Skystar Bio Pharmaceutical Co <br> Address: Nevada Corporation Headquarter Inc | D-52 |
| Additional Defendant | Name: 101 Convention Center Drive #700, Las Vegas NV 89109 <br> Address: | D-53 |

## Notice to Each Defendant

1. **YOU ARE BEING SUED.** This paper is a Summons in a lawsuit. The complaint attached to these papers states the claims that each plaintiff is making against you in this lawsuit.
2. To be notified of further proceedings, you or your attorney must file a form called an "Appearance" with the clerk of the above-named Court at the above Court address on or before the second day after the above Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to come to court.
3. If you or your attorney do not file a written "Appearance" form on time, a judgment may be entered against you by default. The "Appearance" form may be obtained at the Court address above or at www.jud.ct.gov under "Court Forms."
4. If you believe that you have insurance that may cover the claim that is being made against you in this lawsuit, you should immediately contact your insurance representative. Other action you may have to take is described in the Connecticut Practice Book which may be found in a superior court law library or on-line at www.jud.ct.gov under "Court Rules."
5. If you have questions about the Summons and Complaint, you should talk to an attorney quickly. **The Clerk of Court is not allowed to give advice on legal questions.**

| Signed (Sign and "X" proper box) | ☐ Commissioner of the Superior Court <br> ☒ Assistant Clerk | Name of Person Signing at Left <br> Michael Leconas | Date signed <br> 12-29-08 |
|---|---|---|---|

| If this Summons is signed by a Clerk: | For Court Use Only |
|---|---|
| a. The signing has been done so that the Plaintiff(s) will not be denied access to the courts. <br> b. It is the responsibility of the Plaintiff(s) to see that service is made in the manner provided by law. <br> c. The Clerk is not permitted to give any legal advice in connection with any lawsuit. <br> d. The Clerk signing this Summons at the request of the Plaintiff(s) is not responsible for any errors or omissions in the Summons, any allegations contained in the Complaint, or the service of the Summons or Complaint. | File Date |

| I certify I have read and understand the above: | Signed (Self-Represented Plaintiff) <br> A. Chien | Date |
|---|---|---|

Name and address of person recognized to prosecute in the amount of $250

| Signed (Official taking recognizance; "X" proper box) | ☐ Commissioner of the Superior Court <br> ☐ Assistant Clerk | Date | Docket Number |
|---|---|---|---|

(Page 1 of 2)

**CIVIL SUMMONS**
**CONTINUATION OF PARTIES**
JD-CV-2  Rev. 4-97

STATE OF CONNECTICUT
**SUPERIOR COURT**

FIRST NAMED PLAINTIFF (Last, First, Middle Initial)

Chien , Andrew

FIRST NAMED DEFENDANT (Last, First, Middle Initial)

Skystar  Bio Pharmaceutical Co

**ADDITIONAL PLAINTIFFS**

| NAME (Last, First, Middle Initial, if individual) | ADDRESS (No., Street, Town and ZIP Code) | CODE |
|---|---|---|
| | | 03 |
| | | 04 |
| | | 05 |
| | | 06 |
| | | 07 |
| | | 08 |
| | | 09 |
| | | 10 |
| | | 11 |
| | | 12 |
| | | 13 |

**ADDITIONAL DEFENDANTS**

| NAME (Last, First, Middle Initial, if individual) | ADDRESS (No., Street, Town and ZIP Code) | CODE |
|---|---|---|
| Wassung, David | Skystar - Pharmaceutical company Nevada Corporation Headquarter, Inc 101 Convention Center Drive, # 700 Las Vegas, Nevada 89109 | 54 |
| | | 55 |
| | | 56 |
| Lu, Weibing | CEO of Skystar Pharmaceutical Company Nevada Corporation Headquarter Inc. 101 Convention Center Drive, # 700 Las Vegas, Nevada 89109 | 57 |
| | | 58 |
| | | 59 |
| | | 60 |

| | | FOR COURT USE ONLY - FILE DATE |
|---|---|---|
| | 61 | |
| | 62 | |
| | 63 | DOCKET NO. |

**CIVIL SUMMONS-Continuation**

CONNECTICUT SUPREME COURT

------------------------------------x

ANDREW CHIEN:

   PRO SE PLAINTIFF,       **COMPLAINT**

-against-

SKYSTAR BIO PHARMACEUTICAL COMPANY,
SCOTT CRAMER,STEVE LOWE,DAVID WASSUNG   JURY TRIAL DEMANDED
AND WEIBING LU

     Defendants      DECEMMBER 29, 2008

------------------------------------x

   Plaintiff, Andrew Chien ("Mr. Chien", "Chien"), appearing pro se, and for his Complaint ("Complaint"), against Defendants Skystar Bio Pharmaceutical Company (Skystar), Scott Cramer ("Mr. Cramer", "Cramer"), Stave Lowe ("Mr. Lowe", "Lowe"), and David Wassung ("Mr. Wassung", "Wassung"), Weibing Lu ("Mr. Lu", "Lu") alleges the following:

## I. SUMMARY OF THE ACTIOM

   1. This is a Conspiracy, Civil Theft and Securities Fraud lawsuit brought by a shareholder as against the corporation and its Directors. This lawsuit is based on:

- Connecticut Uniform Fraudulent Transfer Act Sec § 52-552a to 52-552l because Defendants engaged breach of fiduciary duty, as well as Civil Theft, or "Larceny" defined by Connecticut General Status § 53a-119, including § 53a-119 (1) Embezzlement, and (2) Obtaining property by false pretenses, and this Larceny is connected with a fraud compensation accounting method as disclosed in April 2006 when the defendants filed 2005 Annual financial Statement to SEC.

- Defendants' frauds acted in the Conspiracy manner.

- Security Frauds such as false accounting, not giving non-affiliated shareholders the voting rights, false shareholder Records, Back-dating Scam, and false SEC annual and quarterly financial reports and 8K filings.

2. In the end of September to November 4, 2005, Andrew Chien by his own or custodian and trust accounts purchased total 6,238,200 shares of Cyber Group Network Corporation ("Cyber", "CGPN"). Cyber was a "shell" company as defined by Rule 405 under the Securities Act of 1933 as well as Connecticut Uniform Security Act § 672a(18) with no office and no any business activity since the end of 2002. On November 7, 2005, Cyber was solvent, and engaged a reverse merger with Skystar by Share Exchange Agreement.

Plaintiff's recent study found that despite of Cyber's "shell" status and no any business activity, Mr. Cramer, as an interim later formal CEO & CFO, made false SEC filings, lied to the pubic that Cyber still engaged the development of a high technology, computer related new product, then hired Mr. Lowe in January 2003 as Director in for investor relation and marketing, and Mr. Wassung in October 2004 as Director for business operation necessity. After made such false story for several years, Cramer, Lowe and Wassung claimed that Cyber owned them unpaid compensation for about one million dollars. In Cyber's book, there were nearly 364 million shares of company's common stock, authorized but not issued in the end of 2004. Then in 2004 and 2005 Cramer, Lowe and Wassung moved the company's shares to their own account twice for total about 355 million of shares, and made their aggregate holdings from 4% (June 30, 2004) to 72% (November 7, 2005) without approval of the non-affiliated shareholders. Especially, on November 7, they moved 323 million shares with market value about $4.2 million to their own book to offset their fabricated remaining debt about $0.9 million without any authorization or pre-disclosure. In April 2006, Defendants filed the 2005 Annual Financial Statement of Skystar, and valued the 323 million shares of common stock at a very deep discount price of the market, which in fact, is false accounting and back-dating scam. Another defendant: New CEO Weibing Lu tolerated their fraud activities. By these frauds Defendants Cramer, Lowe, and Wassung occupied the ownership and economy benefits of Plaintiff and other shareholders. These long time engaged frauds have never being discovered, and caused the stock price long time declined, and hurt Plaintiff more economically, as Plaintiff hold almost of his position until July 10, 2008 and lost 80% of its original value.

Plaintiff hired ex-counsel Mr. Votre in May 2007 to file a Complaint in the United States District Court of Connecticut, with case number 3:07cv781(MRK) based on Security Frauds only. In that original Complaint there missed a lot of important facts found later, and only listed two alleges, and missed the civil theft and false accounting alleges. In July 2008, the District Court denied the two alleges. Although Plaintiff disagree with the ruling, and filed an appeal in August 2008 to the United States Court of Appeals Second Circuit, which is pending, Plaintiff considers that to submit a new lawsuit in the Superior Court, based on the doctrine of equitable estoppel, and added conspiracy and civil theft alleges which were not submitted in the District Court of May 2007's Complaint, would be necessary.

## II. THE PARTIES

3.   Plaintiff, Andrew Chien, a Connecticut resident, purchased the publicly traded securities of Skystar, under its former name of Cyber Group Network Corp, which was, before the merger alleged herein, a publicly traded company, listed on the over the counter market, and publicly available within the District.

4.   Defendant Skystar is a corporation, organized and existing pursuant to the laws of Nevada, with its registered agent of Nevada Corporate Headquarters, INC., 101 Convention Center Drive, #700, Las Vegas, NV 89109, and its principal executive offices at Rm. 10601, Jiezuo Plaza, Fenghui Road South, Gacxin District, Xian Province, People's Republic of China.

Skystar was formerly known as The Cyber Group Network Corporation, which was a corporation organized and existing pursuant to the laws of Nevada, having first been so incorporated under the name of Hollywood Entertainment Network, Inc., on or about September 24, 1998.  On or about May 23, 2000, Hollywood Entertainment changed its name to "The Cyber Group Network Corporation, maintaining its existence as a Nevada corporation.  On or about February 15, 2006, the Cyber Group changed its name to the currently used name of Skystar Bio-Pharmaceutical Company, maintaining its existence as a Nevada Corporation.

5.   Defendant Scott Cramer was at all relevant times herein, Skystar's Chief Executive Officer, and thence a member of its Board of Directors.  Defendant Cramer participated in the issuance of, signed and certified as accurate Skystar's false and

3

misleading SEC filings during the period complained of herein. Scott Cramer is a Florida resident, and has operated his own business Cramer & Associates, INC, 1012 Lewis Drive, Winter Park, FL 32789.

6. Defendant Steve Lowe was a member of Skystar's Board of Directors from January 2003 to October 2006. Steve Lowe is a Pennsylvania resident and employed in PA.

7. Defendant David Wassung was a member of Skystar's Board of Directors from October 2004 to November 7, 2005.

8. Defendant Weibing Lu, was from November 7, 2005 and remains to the present time, the successor president of the defendant Skystar, a member of Skystar's Board of Directors.

**III. JURISDICTION AND VENUE**

9. This court has subject matter and personal jurisdiction over this case because of its connection to Connecticut. Plaintiff is a New Haven, Connecticut's resident. Skystar sells its shares of common stock in USA territory including Connecticut.

Although some of these alleged false business activities and accounting were happened as early as 2003, Plaintiff still considered this case in compliance with the time limitation because *it is the first to bring false accounting alleges to the defendants which needs the confirmation or discoveries of the Court* while Sections 13 of Securities Act, 1933, as amendment, limits the claims brought in within one year *after the discoveries*.

10. Although Mr. Lu is a Chinese citizen, living in China, this court still has jurisdiction effective on him, because

SEC rules Item 101(g) of Regulation S-K requires foreign issues provide disclosure on enforceability of civil liability against foreign persons. If such enforceability fails, Skystar is not qualifying to list in USA OTCBB. Followings are the contents of Item 101(g).

(g)Enforceability of Civil Liabilities Against Foreign Persons. Disclose the following if you are a foreign private issuer filing a registration statement under the Securities Act:
(1) Whether or not investors may bring actions under civil liability provisions of the U.S. federal securities law against the foreign private issuer, any of its

4

officers and directors who are residents of a foreign country, ...... and whether investors may enforce these civil liability provisions when assets of the issuer or these other persons are located outside of the United States. The disclosure must address the following matters:

(i) The investor's ability to effect service of process within the United States on the foreign private issuer or any person;

(ii) The investor's ability to enforce judgments obtained in U.S. courts against foreign persons based upon the civil liability provisions of the U.S. federal securities laws;

(iii)The investor's ability to enforce, in an appropriate foreign court, judgments of U.S. courts based upon the civil liability provisions of the U.S. federal securities laws; and

(iv) The investor's ability to bring an original action in an appropriate foreign court to enforce liabilities against the foreign private issuer or any person based upon the U.S. federal securities laws.

11. Venue in Connecticut is proper since the shares of Skystar are trading in Connecticut and Plaintiff is living in Connecticut.

## IV. FACTS

### Part 1.  Civil Theft & Security Frauds Before Reverse Merger

12. In 2000 and 2001, CGPN wanted to develop and marketing of one device called E-Snitch which can track missing or stolen computers within five feet of their location, and another software products called PPIRT. For the fiscal year of 2001, the Company reported to have ten full-time employees. The operation location was at 720 E. Carnegie Drive, Suite 200, San Bernardino, CA 92408.

13. On February 9, 2001 CGPN hold a shareholder meeting to vote for approval of 1 for 25 reverse stock split.

14. On September 28, 2001, CGPN hold an annual shareholder meeting to elect five directors as required by Bylaws of CGPN.

15. Due to the failure of product development, the Company ceased operation in 2002. In 10KSB for the period ended December 31, 2002, it reported revenue zero, inventory zero, and to stop operation including to have sold all computers and office equipment, and its only assets were $800 cash and some debt.

16. The status of CGPN from year 2002 to November 7, 2005 should classify as a "shell" company following the definition described in Connecticut Uniform Security Act § 672a(18) or Rule 405 under the Securities Act of 1933 and Rule 12b-2 under the Securities Exchange Act of 1934:

"The term *shell company* means a registrant, other than an asset-backed issuer as defined in Item 1101(b) of Regulation AB, that has:

1. No or nominal operations; and
2. Either:
   - No or nominal assets;
   - Assets consisting solely of cash and cash equivalents; or
   - Assets consisting of any amount of cash and cash equivalents and nominal other assets."

17. The Company reported that "Mr. Cramer was a Director on November 8, 2001, and became interim CEO on March 8, 2002." and "Mr. Cramer has been the President of Cramer & Associates, a firm specializing in retirement management, estate planning and investments. Cramer has held this position for many years and has built a solid standing in the investment field. Mr. Cramer currently resides in Florida and will not relocate to California while performing his duties as the Interim CEO."

"Mr. Cramer is paid $60,000 per year in cash, stock, stock options or a combination, thereof".

18. CGPN reported: "Richard Serrano was appointed to the Board and accepted the President position on March 8, 2002. Mr. Serrano is currently the President and CEO of Team400, Inc. in Montebello, CA."

It also reported that Mr. Serrano resigned on December 31, 2004. "As a result of his resignation, the loan amount due to him of approximately $220,000 was negotiated to $45,000". In 10KSB for fiscal year 2005, it reported $45,000 was settled at 2 million of shares of Common Stock.

19. From Paragraphs 15 to 18 above, and CGPN'S associated periodic financial reports, it is obvious that since 2002 till November 2005, CGPN had no office, no business operation, no inventory and no revenue, and no regular employees. Its compensation payment was made through issuance of equity only, and carried by the public shareholders including Plaintiff. It is hard to believe that CGPN needed to hire Lowe in 2003 and Wassung in 2004 as a business operation necessity.

20. Cramer failed to disclose its *shell company status* in the periodic reports since January 2003, or earlier. The shell company usually doesn't have full time employees, and its costs limited to the costs of keeping reporting status, such as monthly transfer agency fee, annual auditing fee, and SEC filing costs if there is any.

21. On 02/10/2003, CGPN reported, "This Form 8-K is being filed to announce the appointment of Steve Lowe to the Board of Directors.  Mr. Lowe's appointment is effective as of January 27th, 2003. Mr. Lowe ... will focus his energies in the areas of Investor Relations and *Marketing and Sales* (emphasis added)." "Mr. Lowe is paid $50,000 per year in cash, stock, stock options or a combination."

22. It also reported "Mr. Lowe is employed by R R Donnelley, North America's largest printer. Mr. Lowe has held positions from entry level to manufacturing supervision during *his eighteen-year employment*.  Lowe is actively pursuing a degree in business management through the Penn State University." These disclosures indicated that Lowe had little time to contribute to CGPN's business and Lowe's activity location of Pennsylvania is far away from Cramer's location in Florida.

23. CGPN also reported that David Wassung was appointed to the Board on October 1, 2004 and resigned effective as of November 7, 2005. There is no disclosure for Wassung's job description and professional background except his compensation: "Mr. Wassung was to be paid $50,000 per year in cash, stock, stock options or a combination."

24. There was no shareholder meeting since 2002 to elect the directors as required by the Bylaws. Therefore, none of Cramer, Lowe and Wassung was approved as a director by Majority Shareholders.

25. From SEC filings of the CGPN's periodical reports ranging from January 1, 2003 to September 30, 2005, in the section of "Item 2. Management Discuss and Analysis or Plan of Operation", it repeatedly wrote:

" ...Because *substantially all of its efforts have been concentrated in research and development activities* (emphasis added), it has operated at a net loss since inception."

In 10KSB for the period ended December 31, 2003, CGPN reported:

"We *are currently marketing* PPIRT to government agencies, corporations and OEM's," and "In late 2001, we removed our PPIRT product off of retail stores shelves and *we expect to be releasing new versions in the second or third quarter of 2004* (emphasis added). The new versions will have significant enhancements and be marketed specifically to Government Agencies, Corporations and Consumers. Each version will have specialized features tailored to that specific market."

In 10KSB for the period ended December 31, 2004, CGPN reported:

7

"We **are currently marketing** (emphasis added) PPIRT to government agencies, corporations and OEM's," and "In late 2001, we removed our PPIRT product off of retail stores shelves. The new versions will have significant enhancements and be marketed specifically to Government Agencies, Corporations and Consumers. Each version will have specialized features tailored to that specific market."

All the reported business activities here were non-existing since CGPN ceased operation in 2002.

26. From the disclosed information, none of Cramer, Lowe and Wassung had any special professional background capable to do the research and development of their hardware and software products.

27. Cramer, Lower and Wassung were directors of CGPN, but not employees, in the definition of "employee" of IRS, because they didn't submit, directly or indirectly, regular services to CGPN for its research and development of its hardware and software products. Although, in periodically reports, it mentioned it needs to raise operating capital. It didn't have disclosure about whether or not anyone among Cramer, Lower and Wassung made material contribution or material time contribution to raise capital.

28. Following table gave us the comparison of Paid Equity for Compensation among Directors.

Table 1:   Paid Equity for Compensation Among Directors
(Note: Calculated until November 7, 2005, when CGPN was solvent)

| Name | Serrano | Cramer | Lower | Wassung |
|---|---|---|---|---|
| Title | President | Chairman | Director | Director |
| Job Description | Managed day to day operation | File SEC periodic reports & Keep CGPN public status | Shareholder Relation & Product Marketing | N/A |
| Service Time | 03/2002-12/2004 (34 months) | 03/2002 - 11/2005 (44 months) | 01/2003-11/2005 (34 months) | 10/2004-11/2005 (15 months) |
| Total Paid Shares (accuracy to 1 million) | 2 million | 231 million | 75 million | 52 million |
| Average paid shares per month (accuracy to 1K-thousand) | 59 K | 5,250 K | 2,206 K | 3,467 K |

29. In Paragraph 28, Table 1 showed although Mr. Serrano was busiest among all directors because of his management of daily operations, plus that he had professional knowledge of the products, his compensation only took 2 million shares for 34-month services (or 59 thousands of shares per month) because there was no business activity

at all. If we could take substantial test for CGPN's business and every employee activities in the future discovery or trial period, Plaintiff believes Mr. Serrano's payment fair while others exaggerated, or fabricated.

30. Cramer, acted as CEO and CFO, was responsible for SEC periodic reports. Initiated from the period ended September 30, 2003, he began to sign Certificates, or to certify under oath or penalty of perjury, that

> "the periodic report containing the financial statements fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 780(d)) and that information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of the issuer."

His certifications are not true at all.

31. From the above Paragraph 12 to 30 above, Cramer reported False Pretenses in the business activities and job description of Lowe. Cramer, Lowe and Wassung intended to falsely state the employment status and business activities.

32. Cramer, Lowe and Wassung claimed about $0.9 million of unpaid compensation or liabilities of CGPN to them before reverse merger with Skystar. A significant percentage of unpaid compensation is fabricated. To fabricate unpaid compensation is civil theft, false accounting and securities fraud.

33. CGPN failed to file 8k Item 5.02 after appointed Wassung as a Director on October 1, 2004.

34. Cramer violated Section 16(a) of Exchange Act of 1934 as he never filed Form 4 to make disclosure about his stock based compensation in December 31, 2004 had reached 17% of total outstanding shares.

## Part 2. Civil Theft & Security Frauds in Reverse Merger

35. On September 26, 2005, CGPN filed 8K to announce that it had entered into a definitive agreement on September 20, 2005 to acquire Skystar in a reverse merger through the issuance of common stock. In the agreement, Skystar agreed to pay $120,000 cash to CGPN to clean the balance sheet.

36. All official documents such as SEC filings, records of transfer agency showed that before November 7 (57 days later than September 20), 2005, Cramer owned 29,294,772 shares, Lowe owned 6,698,366 shares, Wassung owned 5,100,000 shares, and in

9

total they owned 41,093,138 shares, represented 23.2% of then outstanding 177,188,665 shares.

37. In the CGPN's book, there were 500 millions of common stock authorized. The remaining about 323 millions of shares stayed on the book of the company as the company's assets.

38. On November 14, 2005 8k filing, it disclosed that Cramer, Lowe and Wassung moved 98.2% of 323 millions of shares from Company's book to their own accounts without any ex-disclosures and without any authorization when the company was solvent on November 7, 2005. After doing that, Cramer, Lowe and Wassung together owned 72% of then outstanding 500 millions of shares.

39. Despite that Cramer, Lowe and Wassung were Board of Directors, and had claimed (fabricated) unpaid compensation from CGPN, they didn't have the authorization to issue up to 72% of the company's shares to themselves.

40. The action of that Cramer, Lowe and Wassung wanted to own 72% of CGPN by claimed (fabricated) unpaid compensation is defined as **Rule 13e-3** -- Going Private Transactions by Certain Issuers or Their Affiliates, and regulated by **Regulation M-A [17 CFR §§229.1000 - 229.1016]**.

There are two essential things to be done:

- An appraisal report from outside, regarding of going private transactions fairness to nonaffiliated shareholders [§ 229.1015]; and

§ 229.1015  (Item 1015) Reports, opinions, appraisals and negotiations.
  (a) *Report, opinion or appraisal.* State whether or not the subject company or affiliate has received any report, opinion (other than an opinion of counsel) or appraisal from an outside party that is materially related to the Rule 13e-3 transaction, including, but not limited to: Any report, opinion or appraisal relating to the consideration or the fairness of the consideration to be offered to security holders or the fairness of the transaction to the issuer or affiliate or to security holders who are not affiliates.
  (b) *Preparer and summary of the report, opinion or appraisal.* For each report, opinion or appraisal described in response to paragraph (a) of this section or any negotiation or report described in response to Item 1014(d) of Regulation M-A (§229.1014) or Item 14(b)(6) of Schedule 14A (§240.14a-101 of this chapter) concerning the terms of the transaction:
  (1) Identify the outside party and/or unaffiliated representative;
  (2) Briefly describe the qualifications of the outside party and/or unaffiliated representative;
  (3) Describe the method of selection of the outside party and/or unaffiliated representative;
  ......

10

(5) If the report, opinion or appraisal relates to the fairness of the consideration, state whether the subject company or affiliate determined the amount of consideration to be paid or whether the outside party recommended the amount of consideration to be paid; and
(6) Furnish a summary concerning the negotiation, report, opinion or appraisal. The summary must include, but need not be limited to, the procedures followed; the findings and recommendations; the bases for and methods of arriving at such findings and recommendations; instructions received from the subject company or affiliate; and any limitation imposed by the subject company or affiliate on the scope of the investigation.
*Instruction to Item 1015(b)*: The information called for by paragraphs (b)(1), (2) and (3) of this section must be given with respect to the firm that provides the report, opinion or appraisal rather than the employees of the firm that prepared the report.
(c) *Availability of documents*. ......


• A majority vote approval from ***nonaffiliated shareholders*** [§229.1014(c)]: that

means Cramer, Lowe and Wassung not allowed to vote in this case. The

nonaffiliated shareholders, including Mr. Chien, would mostly likely, would

***reject*** to issue majority capital to Cramer, Lowe, and Wassung.

   § 229.1014 (Item 1014) Fairness of the going-private transaction.
   (a) Fairness. State whether the subject company or affiliate filing the statement reasonably believes that the Rule 13e-3 transaction is fair or unfair to unaffiliated security holders. If any director dissented to or abstained from voting on the Rule 13e-3 transaction, identify the director, and indicate, if known, after making reasonable inquiry, the reasons for the dissent or abstention.
   (b) Factors considered in determining fairness. Discuss in reasonable detail the material factors upon which the belief stated in paragraph (a) of this section is based and, to the extent practicable, the weight assigned to each factor. The discussion must include an analysis of the extent, if any, to which the filing person's beliefs are based on the factors described in Instruction 2 of this section, paragraphs (c), (d) and (e) of this section and Item 1015 of Regulation M-A (§229.1015).
   **(c) *Approval of security holders. State whether or not the transaction is structured so that approval of at least a majority of unaffiliated security holders is required*** (emphasis added).

   (Note: **Rule 13e-3** -- Going Private Transactions by Certain Issuers or Their Affiliates **2**. The term *purchase* means any acquisition for value including, but not limited to, **iv.** **any acquisition subject to the control** (emphasis added) of an issuer or an affiliate of such issuer)


Defendants intended to conceal the necessary legal procedure that the Section 14

of Exchange Act of 1934, as amendment, requires proxy in this case.

   41.  To do reverse merger with Skystar also needs majority of CGPN shareholder to

approve [§229.1014(c)]. In the 09/26/2005 8K, Defendants also intended to conceal the

necessary legal procedure that the Section 14 of Exchange Act of 1934, as amendment,

requires proxy when CGPN would complete the reverse merger with Skystar.

42. Cramer, Lowe and Wassung didn't disclose their plan of to acquire 72% of CGPN stock in 09/26/2005 8K or its attached Share Exchange Agreement as required by **Regulation M-A § 229.1006 & § 229.1008.**

§ 229.1006 (Item 1006) Purposes of the transaction and plans or proposals.
(a) *Purposes.* State the purposes of the transaction.
(b) *Use of securities acquired.* Indicate whether the securities acquired in the transaction will be retained, retired, held in treasury, or otherwise disposed of.
(c) *Plans.* Describe any plans, proposals or negotiations that relate to or would result in:
   (1) Any extraordinary transaction, such as a merger, reorganization or liquidation, involving the subject company or any of its subsidiaries;
......
   (9) The acquisition by any person of additional securities of the subject company, or the disposition of securities of the subject company; or
   (10) Any changes in the subject company's charter, bylaws or other governing instruments or other actions that could impede the *acquisition of control* of the subject company.

§ 229.1008(Item 1008) Interest in securities of the subject company.
   (a) *Securities ownership.* State the aggregate number and percentage of subject securities that are beneficially owned by each person named in response to Item 1003 of Regulation M-A (§229.1003) and by each associate and majority-owned subsidiary of those persons. Give the name and address of any associate or subsidiary.
(b) *Securities transactions.* Describe any transaction in the subject securities during the past 60 days. The description of transactions required must include, but not necessarily be limited to:
   (1) The identity of the persons specified in the Instruction to this section who effected the transaction;
   (2) The *date* of the transaction;
   (3) The *amount of securities involved*;
   (4) The *price per share*; and
   (5) *Where and how* the transaction was effected.
*Instructions to Item 1008(b).* 1. Provide the required transaction information for the following persons:
   (a) The filing person (for all schedules);
   (c) Any executive officer, director, affiliate or subsidiary of the filing person (for Schedule 14D-9 (§240.14d-101 of this chapter);
(Note: all bold emphasis added)

43. In order to deliberately conceal the plan of acquiring up to 72% of CGPN shares, and to prevent shareholders from vote or inquiries, Cramer, Lowe and Wassung, in 09/26/2005 8K and attached "Share Exchange Agreement", wrote no word of "vote', and instead, used the following false statements:

- Cramer, Lowe and Wassung "**_represent at least a majority_** (emphasis added) of the issued and outstanding capital stock of CGPN" on September 20, 2005;and
- On September 20, 2005, "the CGPN Shareholders **_have approved_** (emphasis added) the Exchange Agreement and the transactions contemplated thereunder ...",therefore
- "4.4 Authority Relative to this Agreement ...no other actions on the part of CGPN are necessary to authorize this Agreement or the transactions contemplated hereby. This Agreement has been duly and validly **_executed and delivered by CGPN_**

12

_**and the CGPN Stockholders**_ (emphasis added) and constitutes a valid and binding obligation of CGPN and each CGPN Stockholder...."

44. Since that Cramer, Lowe and Wassung only owned 23% of total shares of CGPN in September 2005, is a public information, and some shareholder would put questions on the genuine of Cramer, Lowe and Wassung's _**"represent at least a majority**_ ", Cramer, Lowe and Wassung also wrote following scheming words in 09/26/2005 8K:

> "Section 7.1(b) Representations and Warranties to be True. The representations and warranties of CGPN and the CGPN Stockholders herein contained shall be true in all material respects at the Closing with the same effect as though made at such time".

Section 7.1(b) is a scam because the 09/26/05 8K mentioned: "...the _**CGPN Shareholders have approved**_ (emphasis added) the Exchange Agreement and the transactions contemplated thereunder...." and the action of approval only done by the natural persons, and only by the existing CGPN's shareholders on September 20, 2005. If the representations of the CGPN Stockholders herein contained hadn't be true on September 20, 2005, Share Exchange Agreement should have disclosed that the Agreement only had approved by the CGPN board, not its shareholders, and _**future approval of CGPN Shareholders still pending, then adding such risk of the uncertainty of future CGPN Shareholders' approval.**_ We haven't seen such wording as necessity in the Share Exchange Agreement.

Plaintiff considers Defendants behavior is a _**Shareholder Identity Theft,**_ and _**Overt Act**_.

It is a common knowledge that before you want to make the actions such as shareholder's vote for approval, or shareholder's execution, you must have a _**shareholder qualification in first place**_. This is true for every kind of votes. For example, if anyone wanted to vote for President in November 2008, he must be a US citizen and over eighteen years old and makes registration _**before**_ the day of President election. That any person whose qualification would be _**true only after**_ the day of President election, engages in voting in November 2008, would be considered as a "fraud voter". _**Cramer, Lowe and Wassung were three fraud voters**_ on September 20, 2005 to approve and execute the Share Exchange Agreement.

45. Section 7.1(b) of Share Exchange Agreement violated Article II SHAREHOLDERS, Bylaws of CGPN.

13

Article II. SHAREHOLDERS

SECTION 5. Closing of Transfer Books or Fixing of Record. For the purpose of determining shareholders entitled to notice of or to vote at any meeting of shareholders or any adjournment thereof, or shareholders entitled to receive payment of any dividend, or in order to make a determination of shareholders for any other proper purpose, the Board of Directors of the Corporation may provide that the stock transfer books shall be closed for a stated period, but not to exceed in any case fifty (50) days. If the stock transfer books shall be closed for the purpose of determining shareholders entitled to notice of or to vote at a meeting of shareholders, such books shall be closed for at least ten (10) days immediately preceding such meeting. In lieu of closing the stock transfer books, the Board of Directors may fix in advance a date as the record date for any such determination of shareholders, such date in any case to be not more than fifty (50) days and, in case of a meeting of shareholders, not less than ten (10) days prior to the date on which the particular action requiring such determination of shareholders is to be taken.

Section 10... Shares of its own stock belonging to the Corporation shall not be voted, directly or indirectly, at any meeting, and shall not be counted in determining the total number of outstanding shares at any given time.

The Bylaws regulated the followings: on September 20, 2005 when Defendants claimed that CGPN shareholders, through voting, had approved and executed the Share Exchange Agreements, there were

- about 323 millions of common stock on the book of the company which were not allowed to be voted due to Bylaws Section 10 above, and

- the transfer book of remaining 177 million of shares should be closed no later than September 10, 2005 to determine the qualified shareholders for voting due to Bylaws Section 5 above.

This violation of Bylaw further approved that Section 7.1(b) of Share Exchange Agreement is a scam.

46. More False Statements to Plaintiff

When Plaintiff Chien accumulated the stocks, Chien questioned Mr. Cramer many times asked him whether the 323 million of shares already issued or not, because he couldn't find the associated legal documents to prove its issuance. Mr. Cramer denied the issuance of 323 million shares.

On September 22, 2005, Plaintiff, Andrew Chien, sent an e-mail to Steve Lowe asking whether or not there would be more shares of the common stock issued of the Cyber Group Network on its approximate 177 million outstanding shares, before the

completion of the merger, Steve Lowe misrepresented the Plaintiff by not disclosing the fact, and stated that the "information will be released in the very near future."

On October 18, 2005, Plaintiff sent e-mail to Scott Cramer asking the capital structure of the merger, Mr. Scott Cramer sent e-mail back to Mr. Chien to mislead him by stating: "Please be advised that our legal council is advising us how to handle each step of the merger and release of information so that we are in compliance with all SEC rules and regulations ......" and refused to disclose that they issued or will issue new shares for themselves.

On November 2, 2005, Plaintiff, Andrew Chien, made a telephone call to Mr. Scott Cramer and asked how many shares were outstanding of the Cyber Group Network Corporation. Mr. Scott Cramer told the Plaintiff that the transfer agency has the correct records. On November 2, 2005, Plaintiff subsequently sent e-mail to Pacific Stock Transfer Co and found that the outstanding shares were 177,188,655.

Why Cramer and Lower did that? If either of them had told Plaintiff their scam to issue huge quantity of shares to themselves, Plaintiff would immediately file a complaint to SEC. It might be possible that SEC would question the Company about the genuine of "CGPN Shareholders Have Approved the Share Exchange Agreement" as stated in 09/26/2006 8K, which Defendants didn't want to see.

47. Dependences enabled Plaintiff and other shareholders impossible to make any opposition before the completion of the merger, by arranging on the same announcement as to complete the merger and to move approximately 323 million of shares from the company's book to Cramer, Lowe, and Wassung's accounts as shown in 11/14/05 8K.

48. Plaintiff, as a shareholder of CGPN, has the relation of the investment contract, as defined in Connecticut Uniform Securities Act chapter 672a (17) "Security", with CGPN, whose contents were written in the SEC filing Form 10SB12G (incorporated under the name of Hollywood Entertainment Network, Inc.), dated November 16, 1999:

> (1) Description of Rights and Liabilities of Common Stockholders
> i. Dividend Rights - the holders of outstanding shares of common stock are entitled to receive dividends out of assets legally available therefore at such times and in such amounts as the board of directors of the Company may from time to time determine.

ii. Voting Rights – each holder of the Company's common stock are entitled to **one vote for each share** (emphasis added) held of record on all matters submitted to the vote of stockholders, including the election of directors. All voting is non-cumulative, which means that the holder of fifty percent (50%) of the shares voting for the election of the directors can elect all the directors.

iii. *Liquidation Rights* – *upon liquidation, the holders of the common stock are entitled to receive pro rata all of the assets of the Company available for distribution to such holders* (emphasis added).

This described Plaintiff or other shareholder contract rights against the company's property and ownership related to his (her) holding shares on pro rata portion. As for the company's debt, Plaintiff or other Shareholders are shielded from personal liability for the debts and obligations of CGPN from USA corporation governance.

49. Since after the completion of the reverse merger, the existing shareholders of CGPN total would own 10.5% of the surviving company's shares, which would be a fixed number of 1,260,651 shares (due to 10KSB for the period ended 12/31/2005) after adjustment of 1 for 397 split. The more shares, Defendants Cramer, Lowe, and Wassung had occupied before the completion of the merger, the less the other shareholders including Plaintiff, would possess after the completion of the merger. The absolute number of more shares wrongly appropriated by Defendants Cramer, Lowe, and Wassung exactly equals to the number of shares missed from other shareholders including Plaintiff Chien as shown in the following table:

Table 2. Skystar Shares Ownership Comparison Under Different Distribution Assumptions On November 7, 2005 (after adjustment of 1 for 397 split)

| Assumptions | Owned by Cramer, Lowe, and Wassung together (Shares) | Owned by All other shareholders including Plaintiff | Owned by Plaintiff (Shares) |
|---|---|---|---|
| 1. Assuming 323 millions shares distributed on pro rata to every shareholder on 11/07/2005 | 292,344 | 968,307 | 44,384 |
| 2. Following ownership in 8K filed on 11/14/2005: 323 millions shares issued to Cramer, Lowe, and Wassung. | 917,513 (Increased 625,169 from 1.) | 343,138 (Reduced 625,169 from 1.) | 15,726 (Reduced 28,658 from 1.) |

As share ownership shifted, the economy value moved from Plaintiff and other shareholders to Defendants as shown in Table 2, which adapted price of $5.16 per share in the calculation because an adjustment for 1 for 397 split considered and the closing price of CGPN on November 7, 2005 was $0.013.

Table 3. Share Market Value Comparisons Among Owners On November 7, 2005
(Due to 1 for 397 split, stock value adjusting to $5.16 from $0.013)

| Assumptions | Owned by Cramer, Lowe, and Wassung together (Dollar) | Owned by All other shareholders including Plaintiff | Owned by Plaintiff (Dollar) |
|---|---|---|---|
| 1. Assuming 323 millions shares distributed, on pro rata to every shareholder on 11/07/2005 | $ 1,508,495 | $4,996,464 | $ 229,021 |
| 2. Following ownership in 8K filed on 11/14/2005: 323 millions shares issued to Cramer, Lowe, and Wassung. | $4,734,367 (Profits $3,225,872 from 1.) | $ 1,770,592 (Lost $ 3,225,872 from 1.) | $ 81,146 (Lost $ 147,875 from 1.) |

From Tables 2 & 3 above, Plaintiff lost 28,658 (after an adjustment of 1 for 397 split) floating shares with market value of $ 147,875 on November 7, 2005 when CGPN was solvent.

50. Unjustified rich payment for Cramer, Lowe, and Wassung.

The reason of issuing to Cramer, Lowe, and Wassung so huge quantity of shares with market value of November 7, 2005 about $4.1 million, was to offset their claimed unpaid compensation (a significant percentage of unpaid compensation was false) about $0.9 million. Among them, Cramer's new issued shares total were worth $2,624,043 on his claim of unpaid compensation of $573,270; Steve Lowe's newly issued shares total were worth $885,305 on his claim of unpaid compensation of $195,954; and Wassung's newly issued shares total were worth $604,647 on his claim of unpaid compensation of $133,833.

51. False Accounting for Stock-Based Compensation

Due to SFAS (Statement of Financial Accounting Standards) No.123, "Accounting for Stock-Based Compensation," it encourages the use of the fair value based method of accounting for stock-based compensation arrangements under which compensation costs are determined using the fair value of stock-based compensation determined as of the

17

date of grant. On November 7, 2005, the stock value of the total shares issued to Cramer, Lowe, and Wassung is over $4.1 million. They had over payment of about $3.2 millions.

CGPN is a public entity, whose accounting principles are mandatory dominated by the GAAP (General Accepted Accounting Principles), which requires the CGPN to count the $4.1 million as financial income due to the issuance of about 323 million shares, and then offset the claimed unpaid compensation of $0.9 million, and the remaining overpayment portion of $3.2 million should count as the company's compensation expenses. There also requires writing the Notes to explain why to make $3.2 million overpayment.  However, in the audited financial report for the period ended year 2005, we haven't seen such $3.2 million charge and any literal explanation about the charge. Skystar's earning in 2005 was overstated for about $3.2 million.

52. More Incorrect Accounting:

In 04/17/06 10KSB Skystar disclosed in November 2005, they paid former president Mr. Serrano the stock with market valued of November 7, 2007, at $26,000 only, to exchange unpaid compensation of $45,000. Then they generated debt forgiveness gain of $19,000. We also haven't seen such gain recorded in the audited financial statement for fiscal year 2005.

There is no explanation why the stock priced with huge differences with Mr. Serrano compared with Defendants Cramer, Lowe, and Wassung because the shares were granted on the same day for the same purpose. Such explanation is required by GAAP.

### Part 3. Backdating Scam and More False SEC Filings

53. In the 10k filed on April 17, 2006, Skystar stated the grant date of issuance of the huge quantity of shares to Cramer, Lowe, and Wassung was on September 1, 2005, to replace the statement made in 11/14/05 8K that these shares issued on November 7, 2005. They backdated the stock issuance for 67 days.

54. Regardless of which day Defendants Cramer, Lowe, and Wassung had claimed the acquisition of CGPN, the approval by the board of Directors is not legal, and it must be approved by majority of nonaffiliated shareholders including Plaintiff, which never exists; and

18

55. Also in the financial statement of 10QSB for the three-month period ended September 30, 2005, CGPN only reported about 177 million of shares issued and outstanding, which indicated that backdating report fabricated.

As a public list company, only transfer agency's book of the shareholder list is a legal record. Whenever the public Company issued new shares, the transfer agency needs a filled form plus legal opinion, which Defendants never shows existed in the issuance of new shares dated September 1 or September 20.

Section 17A a.1(A) of the Exchange Act requires a broker-dealer registered, "prompt and accurate clearance and settlement of securities transactions, including the transfer of record ownership..."

Before November 7, 2005, the transfer agency of CGPN only recorded about 177 million of shares. Cramer, Lowe, and Wassung made conflicted ownership records between CGPN's and their transfer agency's from September 1, 2005 and so on. CGPN's ownership records of September 1, 2005 and so on are illegal. Defendants Cramer, Lowe, and Wassung violated:

Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] requires issuers to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of its assets.

56. If the grant date of issuance of the huge quantity of shares to Cramer, Lowe, and Wassung was on September 1, 2005, Cramer, Lowe, and Wassung violated:

- Section 16(a) of Exchange Act of 1934 as all of them never filed Forms 3, 4 or 5 to make disclosure about their stock based compensation in September 1, 2005 had reached above 5% of total outstanding shares; and

- Section 13(15 U.S.C. 78m) or Section 15(d)(15 U.S.C. 78o(d)) of the Securities Exchange Act of 1934 and further Item 403(c) of Regulation S-K (17CFR229.403(c)) or Item 403(c) of Regulation S-B (17CFR228.403(c)), because they fail to follow these regulations to report *Changes in Control of Registrant within four business days of the change*. The reporting should include: (1) the identity of the person(s) who acquire such control; (2) the date and a description of the transactions which resulted in the change in control; (3) the basis of the control including the percentage of voting securities of the registrant now beneficially owned by the person(s) who acquired control; (4) the amount of the consideration used by such person(s).

57. Unfairness to Plaintiff and Other Nonaffiliated Shareholders.

The purpose of the backdating is to get a lower stock price to calculate Stock-Based Compensation. On September 1, 2005, *the reverse merger with Skystar was only insider information*, which caused a lowest stock price date (or period). It proved

19

again that Defendants Cramer, Lowe, and Wassung deliberately concealed the material information to Plaintiff and other nonaffiliated shareholders. Their tender offer price of September 1, 2005 was unfair [17 CFR §§229.1015]. That they used inside information to acquire huge quantities of shares are illegal. Further, Rule SFAS (Statement of Financial Accounting Standards) No. 123 only recognized the legal granted and issued shares of stock, the backdating didn't have legal procedure, and the alleged "False Accounting for Stock-Based Compensation", as mentioned in Paragraphs above intact.

58. Skystar has filed two registration statements for financing purposes, including one on Form SB-2 filed on June 1, 2007, another on Form S-1 filed on May 7, 2008. These registration statements included and/or incorporated by reference the consolidated financial statements for the fiscal year of 2005, and the misrepresentations in Skystar's Form 09/26/05 8K; Form 11/14/05 8K; and Form 04/17/06 10KSB.

59. Defendants Weibing Lu and Scott Cramer signed the two registration statements. Weibing Lu and Scott Cramer caused the registration statements to be and/or signed contained and/or incorporated by references materially false and misleading statements and disclosures.

## IV. Plaintiffs Property Loss Causation

60. In the solvent of CGPN or reverse merger completion on November 7, 2005, outstanding shares of CGPN expanded from 177,188,665 to 500,000,000, Plaintiff should have 11,365,071 (or 28,658 after adjustment 1 for 397 split) shares being distributed to his account due to the shareholder liquidation right. However, 98.2% of Plaintiff's property loss, which were 28,658 shares with market value of $ 147,875 on November 7, 2005, were wrongly appropriated by Cramer, Lowe and Wassung as shown in following table:

Table 4. Plaintiff's Shares And Market Values Wrongly Appropriated By Defendants (Share Number Adjusted 1 for 397 Split, Stock Value Adjusting To $5.16 From $0.013)

|  | Cramer | Lowe | Wassung | Total |
|---|---|---|---|---|
| Wrongly Appropriated | 17,950 | 6,056 | 4,136 | 28,142 |

| Shares | | | | |
|---|---|---|---|---|
| Market Value on November 7, 2005 | $ 92,622 | $ 31,249 | $ 21,342 | $ 145,213 |

This event's fully exposure was in April 17, 2006 when Skystar filed 2005 Fiscal Year Financial Statement with SEC. Whether or not the Civil Theft claim stands out, depends on two important discoveries: the Defendants claimed debt of Skystar fabricated, and the compensation payment accounting method illegal.

61. Plaintiff, in his accounts, and custodian accounts for his son and trust accounts, from September 21, to November 3, 2005, had accumulated 6,238,200 shares of common stock. After an adjustment for 1 for 397 split, he got 15,726 shares with the average cost for more than $5 per share. He sold them separately on July 9 and 10, 2008 for about $1 per share. He lost $65,460, including $738.47 loss on some shares bought on September 21, and sold on September 28, 2005.

62. Poor management. Mr. Cramer was the biggest money gainer and manipulator in this scam of issuing approximately 323 million shares to three insiders. He was CEO of CGPN, and is a Director of Skystar. Mr. Cramer illegally took great economy advantage at the expenses of Plaintiff and other small shareholders. But even today, this illegal case has not been officially discovered and punished. The New CEO Weibing Lu is also responsible for this scam, and signed the annual reports and Registration Statements incorporated with material misstatements. Some traditional USA investors of Skystar tired of holding Skystar shares. Some new investors are afraid to buy the stock.

63. False SEC filings, false disclosure and false accounting issues hang on the stock. Sections 13 of Securities Act, 1933, as amendment, limits the claims brought in within one year after the discoveries. So far, the scam of this case hasn't been discovered. As long as Skystar hasn't corrected these issues such as false SEC filings, false disclosure and false accounting, Skystar is responsible for Plaintiff's both civil theft loss and investment loss no matter how long Plaintiff had held these shares.

64. Plaintiff and other non-inside shareholders never get the vote opportunities to approve or disapprove big events of this company. Cramer, Lower and Wassung illegally deprived Plaintiff's protection of his portion in CGPN's assets.

**V. Alleges**

### First claim: Breach of Fiduciary Duty

65. Plaintiff realleges and incorporates the entire prior paragraphs as if fully set forth herein.

66. Defendants had and have fiduciary duties of loyalty, good faith and due care to the Company's property and all shareholders' interests. They can't be abuse of their control of the Company's assts. Their operation should be compliance with various state and federal laws and regulations including various securities laws and SEC's regulations. Unfortunately, they violated all these.

67. By engaging in the conduct described above, Defendants breached their fiduciary duties of loyalty, good faith and due care.

### Second Claim: Violating Connecticut Unfair Trade Practices Act

68. Plaintiff realleges and incorporates the entire prior paragraphs as if fully set forth herein.

69. Security is the ***investment contract***, as defined in Connecticut Uniform Securities Act chapter 672a (17). When CGPN was solvent on November 7, 2005, Defendants should have the obligation to honor shareholders the ***Liquidation Rights*** as described in the company's early registration statement of 1999, and to distribute the remaining assets (about 323 million shares) on the company's book to every shareholder on pro rata to their holding shares. Unfortunately, Defendants Cramer, Lowe, and Wassung, without any authorization, moved almost all shares with capital value of near $4.1 million from the company's book to their own accounts under the excuse of fabricated unpaid compensation about $0.9 million. These behaviors were immoral, unethical, unscrupulous, and caused substantial injury to Plaintiff. They lost the duty of good faith and substantive fairness in business activity.

70. By engaging in the conduct described above, Defendants violated Connecticut Unfair Trade Practices Act, known as "CUTPA," "Sec. 42-110b Unfair Trade Practices Prohibited," and "Sec. 42a-1-203 Obligation of good faith."

### Third Claim: Violating Connecticut Uniform Fraudulent Transfer Act

71. Plaintiff realleges and incorporates the entire prior paragraphs as if fully set forth herein.

72. Defendants, by engaged in false accounting, depriving of shareholder voting rights, false shareholder Records, Back-dating Scam, and false some SEC annual and quarterly financial reports and 8K filings, violated the Connecticut Uniform Fraudulent Transfer Act Sec § 52-552a to 52-552l.

The deprive of shareholder voting rights violated Connecticut Article 8—Investment Securities "Sec. 42a-8-207. Rights and duties of issuer with respect to registered owners."

### Forth Claim: Engaged in "Larceny"

73. Plaintiff realleges and incorporates the entire prior paragraphs as if fully set forth herein.

74. Defendants engaged in "Larceny", as defined in Connecticut General Status § 53a-119, including:

"(1) Embezzlement. A person commits embezzlement when he wrongfully appropriates to himself or to another property of another in his care or custody."

Herein, Defendants Cramer, Lowe, and Wassung wrongfully appropriated to themselves the 323 million shares of the Company in their care or custody of the Company's property.

"(2) Obtaining property by false pretenses."

Defendants had many false pretenses, including

(a) False Statement of 09/01/05 Granted Majority Ownership:

Skystar made a false ownership statement in the 10k filed on April 17, 2006, when it stated the grant date of issuance of the huge quantity of shares to Cramer, Lowe, and Wassung was on September 1, 2005. There are no any disclosures of SEC filings in Form 10QSB for the period ended September 30, 2005, and Form 8K, Form 4 or 5, no documents of the approval of majority of nonaffiliated shareholders, and no records of Transfer Agency to verify that Cramer, Lowe and Wassung were granted to get a control position in CGPN on September 1, 2005.

(b) False Statement of 09/20/05 Majority Representatives:

23

Cramer, Lowe and Wassung made a false statement in 09/26/05 8K filing: they "represents at least a majority of the issued and outstanding capital stock of CGPN" on September 20, 2005. There are no legal documents, such Form 10QSB for the period ended September 30, 2005, and Form 8K, Form 4 or 5, documents of the approval (or trust) of majority of nonaffiliated shareholders, and no records of Transfer Agency to verify that Cramer, Lowe and Wassung to represents at least a majority of the issued and outstanding capital stock of CGPN on September 20, 2005.

(c) False Statement of 09/20/05 CGPN Shareholder Approval & Execution:

Cramer, Lowe and Wassung made a false statement in 09/26/05 8K filing: on September 20, 2005, "the CGPN Shareholders have approved the Exchange Agreement and the transactions contemplated thereunder ...", therefore "no other actions on the part of CGPN are necessary to authorize this Agreement or the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by CGPN and the CGPN Stockholders and constitutes a valid and binding obligation of CGPN and each CGPN Stockholder...." There is no proxy statement or other legal documents such as other SEC filings or record of Transfer Agency to verify that the CGPN Shareholders had approved and executed the Exchange Agreement on September 20, 2005.

(d) False statements of the business activities and job description for claiming fabricated compensations:

(i) From SEC filings of the CGPN's periodical reports ranging from January 1, 2003 to September 30, 2005, in the section of "Item 2. Management Discuss and Analysis or Plan of Operation", it repeatedly wrote:

" ...Because **_substantially all of its efforts have been concentrated in research and development activities_** (emphasis added)".

(ii) In 10KSB for the period ended December 31, 2003, CGPN reported:

"We **_are currently marketing_** PPIRT to government agencies, corporations and OEM's," and "In late 2001, we removed our PPIRT product off of retail stores shelves and **_we expect to be releasing new versions in the second or third quarter of 2004_** (emphasis added)."

(iii) In 10KSB for the period ended December 31, 2004, CGPN reported:

"We **_are currently marketing_** (emphasis added) PPIRT to government agencies, corporations and OEM's."

24

(iv) On 02/10/2003, CGPN reported, "This Form 8-K is being filed to announce the appointment of Steve Lowe to the Board of Directors.  Mr. Lowe's appointment is effective as of January 27th, 2003. Mr. Lowe ... will focus his energies in the areas of Investor Relations and *Marketing and Sales* (emphasis added)."

(v) David Wassung was appointed to the Board on October 1, 2004 as disclosed in the annual financial statement of 2004.

Defendants made these false pretenses to obtain the company's public property:

- 32,542000 shares of Common stock with a fair value of $192,900 as reported on 10KSB/A of May 20, 2005 for fiscal year ended December 31, 2004, and

- About the 323 million shares with market value about $4.1 million on November 7, 2005.

## Fifth Claim: Engaged in "Conspiracy"

75. Plaintiff realleges and incorporates the entire prior paragraphs as if fully set forth herein.

76. This is a conspiracy because:

(a) This action performed by three people: Cramer, Lowe and Wassung.

(b) To move 323 million shares to their own account without pre-disclosure and without authorization was an illegal action, which was done under the legal excuse of to payoff the unpaid compensation for reverse merger purpose, and false pretense that Majority company's capital approved the merger in September 2005.

(c) Most of the unpaid compensation caused by the non existing new product development and marketing expenses fabricated by the Cramer, Lowe and Wassung for several years.

(d) These acts were done under false accounting method in the issuance huge quantity of deep discounted equity for fabricated unpaid compensation, which greatly reduced Plaintiff holding percentage of the common stock, as well as eventually reduced the common stock value greatly. Plaintiff suffered huge economy damage.

## Relative Securities Fraud Claims

77. Plaintiff realleges and incorporates the entire prior paragraphs as if fully set forth herein.

78. Sixth Claim: Unlawful Representations; Violations of Section 23 of Securities Act.

Cramer, Lowe, and Wassung had no any legal procedure to represent majority of CGPN capital stock on September 20, 2005. Cramer, Lowe, and Wassung had unlawful representations, and violations of Section 23 of Securities Act of 1933, as amendment.

79. Seventh Claim: Proxies Violations of Regulation 14A of Exchanging Act.

Cramer, Lowe, and Wassung had twice violations of Rule 14a-3 of Regulation 14A of Exchanging Act, 1934 as amendment, because they had exchanged its claimed debt for a control position in CGPN on November 7, 2005 without any solicitation of Proxies, and they had approved its reverse merger with Skystar on September 20, 2005 without any solicitation of Proxies.

80. Eighth Claim: Cramer, Lowe, and Wassung violated of Section 17(a) of Securities Act twice in the share offers to themselves: one was on December 31, 2004 with offer 32,542,000 shares of common stock at market value of $ 192,900; another was on November 7, 2005 with offer about 323 million shares with market value of $ 4.1 million.

Cramer, Lowe, and Wassung, and each of them, by engaging in the conduct described above, directly or indirectly, in the offer of securities to themselves by the use of means or instruments of transportation or communication in interstate commerce or by the use of mails:

- to employ any device, scheme, or artifice to defraud, or

- to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

By engaging in the conduct described above, Lowe, and Wassung had violations of Section 17(a) of Securities Act of 1933, as amendment.

81. Ninth Claim: Fraud In Files Of Form 8K; Violations of Exchange Act Rule 13a-11.

Plaintiff realleges and incorporates the entire prior paragraphs as if fully set forth herein.

Cramer, Lowe, Wassung and Weibing Lu, directly or indirectly, made, or caused to be made, materially false or misleading statements in both 09/26/05 Form 8K and 11/14/05 Form 8K, and violated Exchange Act Section 13(a) and Exchange Act Rule 13a-11 thereunder.

82. Tenth Claim: Violations of Exchange Act Section 10(b) and Exchange Act Rule 10b-5 thereunder.

Cramer, Lowe, Wassung and Weibing Lu directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or of a facility of a national securities exchange, knowingly or recklessly:

- employed devices, schemes, or artifices to defraud;
- made untrue statements of a material fact or omitted to state a material fact, necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of securities.

By engaging in the conduct described above, Cramer, Lowe, Wassung, and Weibing Lu violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

83. Eleventh Claim: Violations of Exchange Act Section 13(b)(5) and Exchange Act Rule 13b2-1 because of fraud in any Book, Record & Accounting.

Cramer, Lowe, Wassung and Weibing Lu, directly or indirectly, falsified or caused to be falsified books, records or accounts subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §78m(b)(2)(A)]. By engaging in the conduct described above,

27

Cramer, Lowe, Wassung, and Lu violated Exchange Act Section 13(b)(5) and Exchange Act Rule 13b2-1 thereunder.

84. Twelfth Claim: Violations of Exchange Act Section 13(b)(5) and Exchange Act Rule 13b2-2 because of fraud in record & accounting for auditors & filing.

Cramer, Lowe, Wassung and Lu, directly or indirectly,

- made, or caused to be made, materially false or misleading statements; or
- omitted to state, or caused others to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading, to an accountant in connection with an audit, review or examination of financial statements or the preparation or filing of a document or report required to be filed with the Commission.

By engaging in the conduct alleged above, Cramer, Lowe, Wassung and Lu violated Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

85. Thirteenth Claim: Violations of Exchange Act Section 13(A) and Exchange Act Rule 13a-14 because of fraud in periodic and annual reports.

Lu, signed false certifications in Skystar's annual reports filed for 2005 and 2006, and in quarterly reports filed for the third quarter of 2005 through third quarter 2006. Lu Certified that he had reviewed each of these reports and, based on his knowledge, these reports, (i) did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading and (ii) included financial statements and other financial information which fairly presented, in all material respects, Skystar's financial condition, results of operations and cash flows.

These representations were false, as Lu knew that the filings contained material misstatements and omissions of Skystar's expenses charge caused by the overpayment of Cramer, Lowe, and Wassung stock-based compensation in November 2005. It also contained the backdating misstatements.

Cramer signed the annual reports of 2005 and 2006 because he was a director. When

Cramer was CEO and CFO, he signed the similar certifications above before the completion of reverse merger for many quarterly and annual financial statements of the periods ranged from fiscal year 2003 to the second quarter of 2005, which contained fabrication of the business activities and employment status, and fabricated unpaid compensation.

Cramer, Lowe, Wassung and Lu violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

86. Fourteenth Claim: Defendants are liable on account of false Registration Statements because they're aiding and abetting Skystar's violation of Registration Statements.

Lu and Cramer, directly or indirectly, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of Over-the-Counter Bulletin Board (OTCBB) or otherwise, knowingly or recklessly, solicited by means of Registration Statements (SB-2 in 2007 and S-1 in 2008), which included and/or incorporated by reference the consolidated financial statements for the fiscal year of 2005, and the misrepresentations in Skystar's Form 09/26/05 8K; Form 11/14/05 8K; and Form 04/17/06 10KSB.

Skystar, Lu and Cramer are liable for Civil Liabilities on Account of False Registration Statements as Section 11 of Securities Act of 1933, as amendment.

87. Fifteenth Claim: Defendants are violated Exchange Act Section 13b2-(A) and Exchange Act Rule 13b2-(B) because they're aiding and abetting Skystar's fraud in book, record & accounting.

Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] requires issuers to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of its assets. Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain the accountability of assets.

Skystar violated Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§

78m(b)(2)(A) and 78m(b)(2)(B)].

88. Sixteenth Claim: Civil theft and false accounting for the period before the reverse merger.

*A significant percentage of unpaid compensation of Cramer, Lowe, and Wassung, was fabricated through false statement of business activities, employment status and job activities.* To fabricate unpaid compensation is civil theft, false accounting and securities fraud. Cramer, Lowe, and Wassung are responsible for the fraud.

VI. PAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court issues findings of fact and conclusions of law Defendants committed the alleged violations, then considers the following relief:

### Part 1. Civil Theft Damage Relief

89. 98.2% of Plaintiff's asset loss of 28,658 shares with market value of $ 147,875 were wrongly appropriated by Cramer, Lowe and Wassung as shown in following table 5:

Table 5. Market Value of Wrongly Appropriated Shares from Plaintiff

|        | Cramer    | Lowe      | Wassung   | Total      |
|--------|-----------|-----------|-----------|------------|
| Amount | $ 92,622  | $ 31,249  | $ 21,342  | $ 145,213  |

Plaintiff prays the Court to award full civil theft damage including interest thereon.

90. Plaintiff also prays the Court to award civil theft damage under treble damage provisions of Conn. Gen. Stat § 52-564, Connecticut's civil theft status.

### Part 2.   Investment Damage Relief

72. Awarding compensation damage in favor of Plaintiff for all investment damage (not including civil theft damage) $65,460 including interest thereon;

73. Awarding Plaintiff the reasonable costs and expenses incurred in this action, including ex-counsel fees and expert fees, and other service charges.

### Part 3. Skystar obligated to All Damages Relief

74. Pursuant to the Article of Skystar, Skystar is obligated to indemnity the directors and officers for monetary damage to Skystar. All individual defendants names

here are ex- or current directors and officers of Skystar. Skystar is obligated to all
damage claimed here by Plaintiff.

Plaintiff

ANDREW CHIEN
665 Ellsworth Avenue
New Haven, CT06511
(203)562-8899

Attachment: Purchase and Sale records of Skystar (CGPN) common stock

31

**Records of Purchases and Sales**

From: Andrew Chien
Summary of the Loss: **$ 65460.90**

Record Date: July 10, 2008
Old Symbol: CGPN.OB; New Symbol SKBI.OB

(I)My IRA  Account
Account: E-trade 6719-1297

| Date | Shares | Cost |
|------|--------|------|
| 9/30/2005 | 460000 | $3,695.98 |
| 10/5/2005 | 440000 | $5,184.47 |
| 10/7/2005 | 1100000 | $17,143.97 |
| 10/10/2005 | 1000000 | $16,007.99 |
| 11/4/2005 | 150000 | $1,657.99 |
| Total: | 3150000 | $43,690.40 |

(Reverse Split 1 for 397)

| Service fee | | $20 |
|------|------|------|
| Total: | 7935 | $43,710.40 |

Sold:

| 07/09/2008 | 500 | $  505 |
|------|------|------|
| 07/09/2008 | 2500 | $ 2515 |
| 07/10/2008 | 2500 | $ 2490 |
| 07/10/2008 | 2435 | $ 2411 |
| Total | 7935 | $ 7921 |

Loss: **$ 35789.4**

(2) My cash account
Account: E-trade 6584-6810

| Date | Shares | Cost |
|------|--------|------|
| 10/26/2005 | 79,000 | $1,113.99 |

(Reverse Split 1 for 397)

| Service fee | | $20 |
|------|------|------|
| Total: | 199 | $1,133.99 |

Sold:

| 07/10/2008 | 199 | $ 190.99 |
|------|------|------|

Loss: **$ 969**

(3) My wife Yiguang Fu's  Roth IRA Custodian Account
Account:   E-trade   6809-3049

| Date | Shares | Cost |
|------|--------|------|
| 10/7/2005 | 540000 | $8,291.46 |
| 10/14/2005 | 50000 | $497.99 |
| Total: | 590000 | $8,789.45 |

1

```
(Reverse Split 1 for 397)
Service fee                    $20
Total              1487    $8,809.45
Sold:
07/10/2008         1487    $ 1462.13        Loss: $  7347.32
```

(4) My son Jonathon Chien's  Custodian Education Account

Account:        E-trade 6819-1124

| Date | Shares | Cost |
|------|--------|------|
| 9/30/2005 | 300000 | $2,407.99 |
| 10/4/2005 | 200000 | $1,818.48 |
| 10/7/2005 | 200000 | $3,407.99 |
| Total | 700000 | $7,634.46 |

```
(Reverse Split 1 for 397)
Service fee                    $20

Total              1764    $7,654.76

Sold:
07/10/2008         1764    $ 1736.36       Loss:  $ 5918.14
```

(5) My son Jonathan Chien's  Custodian Cash Account

Ameritrade              780930347

| Date | shares | Cost |
|------|--------|------|
| 9/30/2005 | 500000 | $4,010.99 |
| 10/3/2005 | 140000 | $1,060.99 |
| 10/4/2005 | 5000 | $52.99 |
| 10/5/2005 | 155000 | $1,870.99 |
| 10/7/2005 | 300000 | $5,110.99 |
| 10/11/2005 | 130000 | $1,817.99 |
| 10/12/2005 | 130000 | $1,505.99 |
| 10/13/2005 | 300000 | $3,010.99 |
| 10/14/2005 | 55000 | $511.49 |
| Total | 1715000 | $18,953.41 |

```
   (Reverse Split 1 for 397)
Total              4320    $18,953.41

Sold:
07/10/2008         4320    $ 4309.97     Loss: $ 14643.44
```

There was the loss in My son Jonathon Chien's  Custodian Account,  Ameritrade
780930347  ( same as above (5) )

2

| Buy date | Quan. | Costs | Selling Date | Proceeds | Loss |
|----------|-------|-------|--------------|----------|------|
| 09/21/05 | 150000 | $1971.98 | 09/28&09/21 | 1233.51 | **$738.47** |

(6) My cash account
Ameritade                        199220553

| Date | shares | Cost |
|------|--------|------|
| 10/5/2005 | 4200 | $55.09 |

(Reverse Split 1 for 397)

| Total | | 11 | $55.09 |
|-------|--|----|--------|

Sold:
Market value lower than sale commissions    Loss:    **$ 55.09**

Total shares sold: 15,726 (11 shares also included)

3